**SPRINGWALL, INC., Plaintiff,**

v.

**TIMELESS BEDDING, INC., Defendant.**

**No. 1:00CV1008.**

United States District Court, M.D. North Carolina.

May 21, 2002.

Gary L. Beaver, Adams Kleemeier Hagan Hannah & Fouts, Greensboro, NC, Michael Shaw Hunter, Clontz Clontz & Hunter, Charlotte, NC, for Springwall, Inc.

Mark Floyd Reynolds, II, High Point, NC, Timeless Bedding, Inc.

## MEMORANDUM OPINION

BEATY, District Judge.

## I. INTRODUCTION

This matter is currently before the Court on Plaintiff Springwall Inc.'s ("Plaintiff") Motion for Summary Judgment [Document # 23]. Pursuant to its Motion for Summary Judgment, Plaintiff seeks Judgment in the amount of $92,554.54. According to Plaintiff, this

amount represents funds owed by Defendant Timeless Bedding, Inc. ("Defendant") to Plaintiff under certain licensing agreements. For the reasons stated below, Plaintiff's Motion for Summary Judgment is GRANTED.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The documents available to the Court reveal that Mr. James Schubert ("Mr. Schubert") is the owner and president of Schubert Enterprises, Inc., formerly known as Schubert Industries, Inc., ("Schubert"), an Ohio corporation. Mr. Schubert is also the former majority owner and president of Springwall Group Associates, Inc., ("SGA"), a Minnesota corporation. Schubert had a relationship with the Minnesota Chiropractic Association ("MCA") under which they developed a mattress and box spring set that conformed to the MCA's standards for chiropractic health. Schubert then acquired a trademark on the name "Chiropractic" and marketed the sets with an endorsement from the MCA. According to Plaintiff, on August 10, 1988, Schubert and SGA entered into an agreement with the American Chiropractic Association ("ACA") pursuant to which Schubert obtained the right to market his mattress sets as having been approved by the ACA. As consideration for the ACA's endorsement, Schubert was to pay a royalty of $1.75 to the ACA for every Chiropractic mattress set sold; furthermore, Plaintiff states that Schubert agreed to provide financial assistance to the ACA for future research and education.

Although Schubert owned the Chiropractic Trademark, according to Plaintiff, SGA owned, by assignment, various trademarks used in the manufacture and sale of mattresses and box springs, collectively referred to as the "Springwall Trademarks." In an effort to increase sales of mattress sets bearing the Springwall and Chiropractic Trademarks, Schubert and SGA entered into certain licensing agreements with various entities. Notably, on February 1, 1989, they entered into such agreements with Thomasville Bedding, Inc. to license the Chiropractic and Springwall Trademarks (the "Chiropractic Agreement" and the "Springwall Agreement," respectively, and collectively, the "Licensing Agreements"). Under these Licensing Agreements, Thomasville Bedding, Inc. was to pay royalties to Schubert and SGA in exchange for the right to use the Chiropractic and Springwall Trademarks.[1] Both agreements provided that all rights thereunder could be assigned by the respective licensor, in whole or in part, without notice to the licensee.

---

1. Under the Chiropractic Agreement, the license was granted based on a set fee of $7.75 per set for each set sold at or below a base quota. According to Plaintiff, the base quota was determined by estimating sales potential using the 1987 Buying Power Index. Therefore, the base quota changed each year. Thomasville Bedding, Inc. was also required to pay $4.75 per set for each set sold above the base quota. These amounts were tied to the royalty that Schubert was required to pay to the ACA such that they would increase by the amount of any increase that the ACA might charge to Schubert.

Under the Springwall Agreement, the license fees due were calculated as a percentage of the total gross sales each year. This percentage was linked to the sales recorded in 1988. For example, from 1990 forward, Defendant (Thomasville Bedding, Inc. changed its name to Timeless Bedding, Inc. in March, 1989) was required to pay 0.5% of the total gross sales from 1988 plus an additional 1% of any sales that exceeded the 1988 level. The fees were charged as a flat sum, calculated using the aforementioned percentages and based upon the sales from the previous year. The resulting fee was charged, in equal amounts, on a monthly basis.

Shortly after the execution of the Licensing Agreements, in March, 1989, Thomasville Bedding, Inc. filed an amendment to its charter thereby changing its corporate name to Timeless Bedding, Inc., Defendant in this action. According to Defendant, this name change did not adversely impact the Licensing Agreements. Indeed, Defendant notes that the relationship between the organizations continued after Defendant changed its name to Timeless Bedding, Inc. Thereafter, on December 21, 1990, SGA was merged into Schubert, creating a single entity. Defendant maintains that it knew nothing of this merger, learning of the merger only after the instant litigation began.

On November 1, 1993, Plaintiff notes that the ACA agreement was renegotiated such that Schubert was required to pay increased royalties during 1994, 1995, and 1996. Accordingly, Plaintiff claims that, as provided in the Chiropractic Agreement, Schubert was required to increase the amount charged to and owed by its licensees thereunder. According to Plaintiff, these cost increases were implemented gradually, over a period of several years, "to avoid imposing a large cost increase to [Schubert's] licensees all at once." (Br.Supp.Mot.Summ.J., at 5.) Nevertheless, Plaintiff argues that payment from Defendant was often late. In fact, Plaintiff claims that Schubert frequently allowed Defendant additional time within which to pay the royalties due. Plaintiff insists, however, that at no time did Schubert ever accept less money than the amounts required to be paid under the Licensing Agreements; likewise, Plaintiff maintains that Schubert never waived its right to full payment of the amounts due.

Sometime in early 1997, Sleep Products International, Inc., a company apparently unrelated to Schubert, formed a new Florida corporation named Springwall, Inc.,[2] and "through this new corporation, purchased the licensing rights to the Chiropractic and Springwall Trademarks from Schubert."[3] (*Id.*) Accordingly, Plaintiff claims that Schubert entered into an agreement with Springwall, Inc. (Fla.) whereby Schubert assigned all rights and Springwall, Inc. (Fla.) assumed all duties under the Licensing Agreements.

Around this same time, officials at Springwall, Inc. (Fla.) noticed that the amounts due under the Licensing Agreements had not been properly calculated. Springwall, Inc. (Fla.), then, sent a letter to Defendant, on June 2, 1997, setting forth the corrected monthly payments due for 1997 and requesting payment therefor. According to Plaintiff, Springwall, Inc.

**2.** The record is not entirely clear on this point. Plaintiff states, in its Brief in Support of Motion for Summary Judgment, that the new entity was incorporated in Delaware in 1997. The record suggests, however, that if Springwall, Inc. did originate in Delaware, it eventually became a Florida corporation, for it ultimately merged with a Delaware entity of the same name to form the Plaintiff in this case. The Delaware Springwall, Inc. with which the Florida Springwall, Inc. merged, did not exist until April 15, 1998.

Also significant is an affidavit provided by Plaintiff from the Secretary and Vice President of Springwall, Inc. that clearly states that the new corporation was incorporated under the laws of Florida. The Court will therefore assume that Plaintiff's reference to Delaware in describing the corporation formed by Sleep Products International, Inc. in 1997 was a mistake.

**3.** Because the Plaintiff in this action is Springwall Inc., a Delaware corporation, and many of the relevant facts involve a Springwall, Inc. from Florida, the distinction between the two entities may become easily confused. To alleviate any potential confusion, the Court will refer to the Delaware Springwall, Inc. only as "Plaintiff" and the Florida entity solely as "Springwall, Inc. (Fla.)."

(Fla.) also discovered that Defendant had not properly reported its mattress set sales for 1994, 1995, and 1996. Springwall, Inc. (Fla.) therefore, on July 10, 1997, sent blank royalty forms to Defendant, requesting that Defendant complete them to reflect the proper sales figures so that the royalty amounts for those years could be accurately calculated. Defendant, however, failed to complete these forms. According to Defendant, it did not complete the forms because they related to years during which Springwall, Inc. (Fla.) "did not have any involvement" with the Licensing Agreements. (Def.'s Br.Supp.Mot.Summ.J., at 4 [hereinafter Defendant's Response].) [4] Because Defendant did not complete the forms, Springwall, Inc. (Fla.) set out to obtain the relevant information.

According to Plaintiff, the Chiropractic Agreement provided that "the Licensor ... has the right to examine and/or audit the books and records of Licensee for purposes of verifying, *inter alia*, the number of sets sold, the gross dollar amount of sets sold, and the accuracy of the amounts payable by Licensee...." (Br.Supp.Mot.Summ.J., at 6.) Springwall, Inc. (Fla.) therefore retained Mr. Robert K. Doyle ("Mr. Doyle") of Spoor Doyle & Associates, P.A. to examine Defendant's sales records and verify its sales data. The parties dispute whether Mr. Doyle made an appointment with Defendant for the purpose of reviewing the records. Nevertheless, when Mr. Doyle arrived at Defendant's headquarters on September 4, 1997, he was not allowed access to the relevant records. According to Defendant,

they were unable to provide Mr. Doyle access because "their computers were down" and their focus was to "get the computers running again." (Def.'s Resp., at 4.)

Because he was unable to ascertain the relevant data, Plaintiff claims that Mr. Doyle was "forced to extrapolate the limited data that he was provided and information obtained from other sources to complete a royalty report for 1996 and obtain the base sales for 1988." (Br.Supp.Mot.Summ.J., at 7.) Upon completing his report, Plaintiff notes that Mr. Doyle sent his conclusions to Defendant and specifically requested information relating to a discrepancy regarding the number of sets reported as sold and the number of labels ordered for those sets. When Mr. Doyle got no response from Defendant, he contacted Defendant's office directly. Although he received no additional sales information, Mr. Doyle was told that too many labels were ordered in 1996. Defendant claims that a portion of the excess labels was sold to other manufacturers, while others remain in storage.

Using the information gathered by Mr. Doyle, Springwall, Inc. (Fla.) completed the corrected 1996 royalty reports and "by letter dated November 14, 1997, demanded that [Defendant] pay the overdue amounts within thirty (30) days to avoid default under the Licensing Agreements." (*Id.*) According to Plaintiff, Springwall, Inc. (Fla.) also demanded that Defendant pay for Mr. Doyle's services in examining the available data to calculate the correct royalty information.[5] Plaintiff claims, though,

---

**4.** Defendant filed a Motion for Summary Judgment [Document #30] on August 10, 2001. Defendant's Motion for Summary Judgment, however, was stricken from the record by Order [Document #55] of this Court, dated December 12, 2001. Nevertheless, when contacted Defendant indicated that ·

his Brief in Support of Motion for Summary Judgment was to serve as the response, or opposition brief, to Plaintiff's Motion for Summary Judgment [Document #23] filed on July 2, 2001.

**5.** Plaintiff made its demand for payment of Mr. Doyle's examination pursuant to the Chi-

that Defendant failed to respond and did not make the payment as requested by Springwall, Inc. (Fla.). In fact, Defendant admits that it ignored Springwall, Inc. (Fla.)'s invoices, claiming that such action was proper because the invoices were "totally false and inaccurate." (Def.'s Resp., at 6.)

In January, 1998, Mr. Robert Allen ("Mr. Allen"), President of Timeless Bedding, Inc., and Mr. Allen Skaling ("Mr. Skaling"), Secretary and Vice President of Springwall, Inc. (Fla.) engaged in a series of correspondences, the result of which was an agreement, according to Plaintiff, that Defendant would have until January 12, 1998 to provide the correct sales figures for 1996. Plaintiff also claims that the gentlemen agreed that once the proper sales figures were provided, the Licensing Agreements would be terminated. Thereafter, Mr. Allen and Mr. Skaling spoke by telephone on January 12, 1998, at which time Mr. Allen allegedly reported that Defendant's sales for 1996 totaled $6,053,360.45 and the number of Chiropractic sets sold in 1996 was 4571. In a letter dated January 19, 1998, Mr. Allen confirmed the aforementioned figures and reported that Defendant's total sales for 1997 was $6,701,162.19. Mr. Allen also indicated that the Licensing Agreements would be terminated effective March 1, 1998. In a subsequent letter, dated February 6, 1998, Mr. Allen reported that the total number of Chiropractic sets sold during 1997 was 7406.

According to Plaintiff, Springwall, Inc. (Fla.) accepted the effective date of Defendant's termination and, "based upon the figures provided by Mr. Allen, Mr. Skaling

calculated the amounts owed by [Defendant] for years 1996 and 1997 and informed Mr. Allen of the amounts due in a letter sent by fax to Mr. Allen on February 12, 1998." (Br.Supp.Mot.Summ.J., at 8–9.) Defendant apparently never responded to this fax. Accordingly, Plaintiff notes that Mr. Skaling sent a letter, on May 27, 1998, informing Mr. Allen of the total sum due, allegedly $87,923.06, and stating that the full amount was in the process of being invoiced. Mr. Skaling also requested sales figures for 1998 "so that any amounts due for that period could be calculated." (*Id.*, at 9.) Notably, Defendant failed to respond to Springwall, Inc. (Fla.)'s demands for payment and never provided the requested sales data for 1998.

On February 19, 1999, Springwall, Inc. (Fla.) merged with a Delaware corporation of the same name.[6] The resulting entity, a Delaware corporation also named Springwall, Inc., is the Plaintiff in this action. As part of the merger, Plaintiff assumed all the rights and duties of Springwall, Inc. (Fla.), including those relating to the Licensing Agreements. Because of Defendant's failure to respond to the demands of Springwall, Inc. (Fla.), Plaintiff filed a lawsuit in North Carolina Superior Court, Gaston County, North Carolina in January, 1999. Plaintiff's suit sought to recover unpaid royalties based on the sales figures provided by Mr. Allen. Because Plaintiff was not incorporated under the laws of or conducting business in the State of North Carolina and failed to secure the requisite Certificate of Authority, the Gaston County Court, on March 16, 1999, dismissed the action without prejudice.

---

ropractic Agreement. According to Plaintiff, paragraph 11 of the Chiropractic Agreement provided that if an audit revealed that the licensee under-reported gross sales by more than 5%, the licensee could be required to pay for the cost of the examination.

**6.** As previously noted, the Delaware version of Springwall, Inc. was incorporated on April 15, 1998.

On May 31, 2000, however, Plaintiff secured its Certificate of Authority from the North Carolina Secretary of State. Plaintiff therefore re-filed its lawsuit, this time in the General Court of Justice, Superior Court Division, Davidson County, North Carolina, on June 8, 2000. Thereafter, on October 6, 2000, this matter was removed to this Court based on diversity jurisdiction. Pursuant to its suit, Plaintiff seeks $92,554.54, representing unpaid balances for 1996, 1997, and 1998, as well as funds to cover Mr. Doyle's auditing services. The Court notes that the parties have been involved in numerous discovery disputes, all of which have been addressed by Magistrate Judge P. Trevor Sharp. Therefore, the only matter currently before the Court is Plaintiff's Motion for Summary Judgment

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* As a result, the Court will only enter summary judgment in favor of the plaintiff when the record " 'shows a right to judgment with such clarity as to leave no room for controversy' " and clearly demonstrates that the non-moving party " 'cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc.*

*v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir.1967)).

When ruling on a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party, according that party the "benefit of all reasonable inferences." *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 56 (4th Cir.1995), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). The moving party bears the initial burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). Once the moving party has met this burden, the adverse, or non-moving party must set forth specific facts showing that there is at least one genuine issue for trial. *Id.* In so doing, the adverse party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202. In other words, the non-moving party must show "more than ... some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of his position is insufficient to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Catawba Indian Tribe*, 978 F.2d at 1339.

■ Finally, when consideration of a motion for summary judgment involves a matter of contract interpretation, the first step for the Court is to determine whether the contract is ambiguous on its face. *World–Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 245 (4th Cir.1992) ("Only an unambiguous writing justifies

summary judgment without resort to extrinsic evidence, and no writing is unambiguous if susceptible of two reasonable interpretations." (internal quotations omitted)). As long as the contract—or the extrinsic evidence submitted along with the summary judgment materials—is unambiguous on the dispositive issue, then the Court may properly interpret the contract as a matter of law and enter summary judgment. *Id.* "If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact." *Id.* The substance of this lawsuit involves Plaintiff's claim that Defendant has not fully honored its obligations to pay royalties under the Licensing Agreements. Therefore, consistent with Fourth Circuit law, the Court must first consider the nature of the relevant portions of the Licensing Agreements to determine whether they are ambiguous.

### B. The Nature of the Licensing Agreements

Although Defendant submits several arguments in opposition to Plaintiff's Motion for Summary Judgment, each of which will be individually addressed in turn, the only argument raised by Defendant that fairly relates to the Licensing Agreements is his claim that assignment of rights under the contract is not permissible.[7] The Court is only required to consider the ambiguity of the relevant contracts with respect to dispositive issues. Therefore, because Defendant has only specifically challenged the propriety of assignment, at this point the Court need only consider those portions of the Licensing Agreements that relate to the issue of assignment.

With respect to the Chiropractic Agreement, paragraph 28 states:

> All rights of Schubert hereunder may be assigned, either in whole or in part without notice to Licensee. Provided, that no such assignment shall relieve Schubert from its obligations hereunder and Schubert shall require any such assignee to perform all duties, covenants and conditions required to be performed by Schubert under the terms of this Agreement. Neither this Agreement nor any interest therein is assignable or transferrable by Licensee or by operation of law without the prior written consent of Schubert, which consent shall not be unreasonably withheld.

(Br.Supp.Mot.Summ.J. ex. 1–B, at ¶ 28.) This paragraph of the Chiropractic Agreement clearly contemplates assignment and states that Schubert may assign its rights thereunder. This Court therefore finds that the assignment provision contained in the Chiropractic Agreement is unambiguous.

With respect to the Springwall Agreement, the Court notes that the assignment provision is substantially similar to that of the Chiropractic Agreement. In fact, the only material term that differs is the fact that the assignment provision in the Springwall Agreement refers to SGA in-

---

**7.** Defendant does not directly challenge Plaintiff's calculations regarding the fees due under the Licensing Agreements. In fact, as previously indicated, Plaintiff primarily used the figures provided by Defendant in calculating the amounts due. Nevertheless, to the extent Defendant's argument may be construed as raising a challenge to the figures sought by Plaintiff, this Court finds that, after reviewing the Licensing Agreements, they are unambiguous as to the royalties due thereunder. They each plainly set forth a mathematical formula, based on the number of sets sold, by which the fees were calculated. The essential provisions of the fee arrangements under each of the Licensing Agreements is set forth in note 1, *supra*.

stead of Schubert. Consistent with the Chiropractic Agreement, this Court also finds that the assignment provision contained in the Springwall Agreement is unambiguous. Because the provisions of the Licensing Agreements that are relevant to this case are not ambiguous, the Court must now apply the terms of the contracts to determine whether summary judgment is appropriate. *World–Wide Rights*, 955 F.2d at 245.

### C. Plaintiff's Showing Under the Licensing Agreements

In considering the Licensing Agreements, the Court notes that, per the express language thereof, the Chiropractic Agreement is to be construed under the laws of Ohio while the Springwall Agreement is subject to the laws of Minnesota. The Court further notes that the rights under the original Licensing Agreements were assigned to Schubert via the merger between Schubert and SGA. The rights were next assigned by Schubert to Springwall, Inc. (Fla.) and then to Plaintiff via the merger between Springwall, Inc. (Fla.) and the Delaware Springwall, Inc. To determine the effect of these assignments, the Court must assess the validity of the assignment provisions contained in the Chiropractic Agreement and the Springwall Agreement under the laws of Ohio and Minnesota, respectively.

■ Ohio statutory law provides that, "unless otherwise agreed[,] all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party...." Ohio Rev.Code Ann. § 1302.13. Further, "[a]n assignment of 'the contract' or of 'all my rights under the contract' or an assignment in similar general terms is an assignment of rights and unless the language or the circumstances ... indicate the contrary, it is a delegation of performance of

the duties of the assignor...." *Id.* In other words, according to Ohio law, the general rule is that for an assignment to be valid, the assignee must also assume the assignor's obligations under the contract. *Litton ABS v. Red–Yellow Cab Co.*, 64 Ohio App.2d 111, 411 N.E.2d 808, 810 (1978) ("The general rule is that an assignment does not cast upon the assignee any affirmative liability on the contract assigned unless there is an assumption of the assignor's obligations under the contract."). As long as this requirement is met, the assignee stands in the shoes of the assignor, taking all rights under the contract and remaining subject to all defenses the obligor may have had against the assignor. *Citizens Federal Bank, F.S.B. v. Brickler*, 114 Ohio App.3d 401, 683 N.E.2d 358, 364 (1996).

■ In the instant case, Plaintiff acquired its rights with respect to the Chiropractic Agreement from Schubert through a series of several assignments. Such assignment was authorized by law and expressly contemplated by the Chiropractic Agreement, which used general words of assignment to clearly indicate that such action was permitted under the contract. Furthermore, based on the fact that the successive assignees were required to permit Defendant to use the Chiropractic Trademark, it is clear that Plaintiff, as well as the other assignees, assumed Schubert's original obligations under the Chiropractic Agreement. Because the language used was sufficient to permit assignment, and Plaintiff assumed the obligations under the Chiropractic Agreement, this Court finds that the assignment clause contained in the Chiropractic Agreement effectively transferred all rights thereunder to Plaintiff.

■ With respect to the Springwall Agreement, Minnesota law provides that unless the parties agree otherwise, all

rights under a contract, whether they operate in favor of the buyer or the seller, may be assigned provided such assignment does not "materially change the duty of the other party...." Minn.Stat.Ann. § 336.2–210(2). General language of assignment, such as that used in the Springwall Agreement, operates as an assignment of rights "unless the language or the circumstances ... indicate the contrary." Minn.Stat.Ann. § 336.2–210(5). Such an assignment vests the assignee with "the same right, title, or interest that the assignor had" in the contract, meaning that the assignee "stands in the shoes of the assignor." *Geldert v. Am. Nat'l Bank*, 506 N.W.2d 22, 28–29 (Minn.Ct.App.1993). The Minnesota law regarding assignment is notably similar to the assignment laws of Ohio. Accordingly, for the reasons explained in conjunction with the Court's consideration of the Chiropractic Agreement, this Court also finds that the assignment provisions contained in the Springwall Agreement effectively transferred all rights thereunder to Plaintiff.

Based on the assignment of rights under the Licensing Agreements, Plaintiff claims that it is entitled to recover unpaid royalties, as well as other relevant funds, in the amount of $92,554.54. These royalties went unpaid largely because Defendant under-reported its sales of Chiropractic mattress sets during 1996, 1997, and 1998. Plaintiff was not involved with the Licensing Agreements during those years. Nevertheless, because Plaintiff stands in the shoes of the other licensors by way of assignment, it can assert their right to recover the unpaid funds. Specifically, Plaintiff claims that Defendant owes $8,790.25 under the Chiropractic Agreement and $17,223.58 under the Springwall Agreement for 1996. Plaintiff further claims that Defendant owes $22,121.25 under the Chiropractic Agreement and $23,701.60 under the Springwall Agree-

ment for 1997. In 1998, at least up to the termination of the Licensing Agreements, Plaintiff claims that Defendant purchased various goods and services from Springwall, Inc. (Fla.). After crediting $423.00 for services provided to Plaintiff by Defendant, Plaintiff claims that it is owed $16,086.38 for 1998. Finally, Plaintiff seeks $4,631.48 for the cost of Mr. Doyle's services in auditing Defendant's sales records.

Notably, Defendant does not challenge the figures or the calculations submitted by Plaintiff as part of its Brief in Support of Motion for Summary Judgment. In fact, as noted previously, the figures relied upon by Plaintiff were predominately provided by Defendant. The fact that Defendant subsequently provided updated sales information to Plaintiff indicates that Defendant recognizes that it under-reported sales for the years in question. Therefore, to the extent Plaintiff has provided documentation of the figures provided by Defendant, and those figures remain unchallenged, this Court finds that Plaintiff has met its burden to establish a right to recovery. Based on the summary judgment standard, Defendant has the responsibility to identify genuine issues of material fact that should cause this matter to proceed to trial. *Catawba Indian Tribe*, 978 F.2d at 1339.

D. Defendant's Opposition to Plaintiff's Showing Under the Licensing Agreements

With respect to the instant motion, Defendant has identified four distinct challenges to Plaintiff's request for summary judgment on the issue of unpaid royalties. Specifically, Defendant's arguments are:

(1) that the suit is not proper because the events at issue occurred before Plaintiff secured its Certificate of Authority;

(2) that SGA "does not exist" and Plaintiff should not be able to "revise" the contract to assert claims against Defendant;

(3) that if the Court applies the doctrine of assignment, such assignment would materially alter Defendant's duty under the contracts; and

(4) that Plaintiff's claim concerning goods and services during 1998 is untrue.

Defendant also challenges Plaintiff's request to recover Mr. Doyle's auditing fees, claiming that Mr. Doyle arrived without notice and based his conclusions on false assumptions. As demonstrated below, however, Defendant's challenges—with respect to both royalties and Mr. Doyle's fees—are insufficient to withstand Plaintiff's Motion for Summary Judgment.

In considering the issue of unpaid royalties, Defendant's first challenge is that Plaintiff's suit is not proper because Plaintiff did not acquire a Certificate of Authority in time. The North Carolina Business Corporation Act provides that a foreign corporation may not maintain a suit in North Carolina without securing a Certificate of Authority from the North Carolina Secretary of State prior to trial. N.C.Gen. Stat. § 55–15–02(a). Plaintiff ultimately received its Certificate of Authority on May 31, 2000. Thereafter, on June 8, 2000, Plaintiff initiated this action in state court. Nevertheless, Defendant argues that because the events on which Plaintiff's claim relies occurred prior to the date on which Plaintiff received its Certificate of Authority, this suit is improper. Defendant's position, however, is based on an unpersuasive reading of the relevant law.

■ The North Carolina Business Corporation Act clearly states that "the failure of a foreign corporation to obtain a certificate of authority does not impair the validity of its corporate acts or prevent it from defending any proceeding" asserted against it in North Carolina. N.C.Gen. Stat. § 55–15–02(e). Therefore, the validity of contracts is not impacted by the existence, or lack thereof, of a Certificate of Authority. In fact, the Official Comment to § 55–15–02 states that harsh sanctions for failure to obtain a Certificate of Authority are not appropriate and that "a contract made by a nonqualified corporation may be enforced by the corporation simply by obtaining a certificate." N.C.Gen.Stat. § 55–15–02 Official Comment. That is exactly what Plaintiff did in this case. After its initial state court action was dismissed without prejudice, Plaintiff secured the requisite Certificate of Authority, and reinitiated its lawsuit in compliance with § 55–15–02.[8] Accordingly, Defendant's claim that Plaintiff cannot assert an action based on events that predate its Certificate of Authority is not persuasive.

■ Defendant's second challenge to Plaintiff's request for unpaid royalties is

**8.** Of course, Plaintiff had to resubmit its lawsuit within the applicable statute of limitation. Notably, any savings period that may be granted by the judge that dismisses a case involuntarily but without prejudice under Rule 41(b) of the North Carolina Rules of Civil procedure does not operate to restrict the traditional statute of limitation. *84 Lumber Co. v. Barkley*, 120 N.C.App. 271, 272–73, 461 S.E.2d 780, 782 (1995). The general statute of limitation for contract debts is, of course, three years. N.C.Gen.Stat. § 1–52(1). Moreover, a promise to pay the debt may extend this period to three years from the date of the promise to pay. N.C.Gen.Stat. § 1–26; *Coe v. Highland Sch. Assocs. Ltd. P'ship*, 125 N.C.App. 155, 157, 479 S.E.2d 257, 259 (1997). In a January 19, 1998 letter to Plaintiff, Defendant agreed to set up a payment schedule to pay off its debt from the unpaid royalties. Plaintiff was, therefore, well within the three year statute of limitation when it filed the instant lawsuit on June 8, 2000.

that SGA—the original party to the Springwall Agreement—no longer exists and Plaintiff should not be able to rewrite the contract to assert claims against Defendant. Defendant essentially argues that Plaintiff was not a part of the contract with SGA and should not be able to sue for its enforcement. As discussed previously, Plaintiff acquired the rights under the Springwall Agreement by way of assignment from Schubert. Schubert had previously acquired its rights under the Springwall Agreement through a merger with SGA. Accordingly, because of the assignment, Plaintiff stands in the shoes of SGA. Such does not "revise" the terms of the contract, as claimed by Defendant. Therefore, in light of the doctrine of assignment, Defendant's claim that the Court must "revise" the Springwall Agreement before Plaintiff can enjoy the rights thereunder is simply inaccurate.

■ Apparently asserting an alternative argument, Defendant's third challenge as to Plaintiff's claim for unpaid royalties states that in the event the Court accepts Plaintiff's reliance on assignment, such assignment should be invalid because it would materially alter Defendant's duty under the Licensing Agreements. Defendant claims that prior to the assignment, it was only obligated to pay a royalty of .5% to the licensors for the use of the Springwall and Chiropractic Trademarks.[9] Defendant further argues that if Plaintiff's position is accepted, its liability will "more than double." Of course, the plain language of the Springwall Agreement stated that a royalty of .5% would apply to all sales up to the sales level established in 1988. Any sales that exceeded the 1988 level were, according to the Springwall Agreement, subject to a royalty of 1%. Had Defendant accurately reported its sales in 1996 and 1997, they would have exceeded the 1988 level. Therefore, the fact that Defendant enjoyed the lower .5% royalty charge was a direct result of its under-reported sales. Defendant, then, cannot now claim that its duties under the Licensing Agreements will be materially altered when an application of the plain language of the contracts mandates an increased royalty payment. The only thing that kept Defendant from paying the higher royalty in the first place was its own miscalculation. Accordingly, this Court finds Defendant's third challenge unpersuasive.

Defendant's fourth challenge to Plaintiff's request for unpaid royalties involves only those funds that relate to 1998. As stated previously, Plaintiff alleges that Springwall, Inc. (Fla.) provided Defendant with certain goods and services. According to Plaintiff, Defendant still owes $16,086.38 for those items. In support of this claim, Plaintiff provided a series of invoices detailing the charges against, and payments received on Defendant's account. Defendant maintains, however, that it did not order the items that Plaintiff sent. Notably, Defendant provides no support, by way of affidavit or otherwise, for this claim. Defendant simply states that it did not order the items, and therefore should not be required to pay for them. Without any indication that Defendant's position is

---

9. The Court notes that only the Springwall Agreement included a royalty of .5%. Moreover, the .5% level applied only up to the sales level established in 1988. Any sales that exceeded the 1988 level faced a royalty of 1%. The Chiropractic Agreement, on the other hand did not involve a royalty based on a percentage of total sales. Rather, it was based on a fixed amount that was charged for each set sold. Therefore, Defendant's argument regarding the purported material alteration of its duty does not even involve the Chiropractic Agreement. Nevertheless, Defendant's argument is unpersuasive. For a more detailed description of the royalty calculations, see note 1, *supra*.

accurate, or any record that Defendant returned the items that it purportedly did not order, Defendant cannot rest on its unsupported allegations and denials. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202. Because Defendant provides absolutely no support for its claim that it did not order the items as alleged by Plaintiff, the Court must find that Defendant's fourth challenge as to unpaid royalties is also unpersuasive.

■ With respect to Plaintiff's request for funds to cover Mr. Doyle's services, Defendant claims that Mr. Doyle arrived unannounced and based his conclusions on false assumptions. The Chiropractic Agreement provided, however, that the licensor had the right to examine Defendant's records for the purpose of data verification. The contract did not include a notice requirement. Further, Defendant has not provided the Court with any authority to support the proposition that such notice should be given as a matter of law. In considering Defendant's claim that Mr. Doyle's conclusions were based on speculation, the Court notes that Defendant refused to grant Mr. Doyle access to the relevant records. Defendant, therefore, cannot claim that Mr. Doyle did not use data directly from its records when Defendant refused to grant him access as required under the Chiropractic Agreement.[10]

The Chiropractic Agreement also stated that if the audit revealed an inaccuracy of more than 5%, the licensee shall be required to surrender funds to cover the cost of the audit. There is no question that Defendant under-reported its sales for the years at issue. In fact, by providing Mr. Skaling with corrected figures, Defendant all but admits that it did not accurately report its sales figures. Because Mr. Doyle's audit uncovered this discrepancy, and it clearly exceeded the 5% threshold, this Court finds Defendant's challenge to Plaintiff's request to recover Mr. Doyle's fees to be unpersuasive.

In sum, each of the challenges raised by Defendant to Plaintiff's request for unpaid royalties fails to establish a genuine issue of material fact warranting a trial. Similarly, Defendant has failed to successfully challenge Plaintiff's request to recover Mr. Doyle's auditing fees. Accordingly, this Court finds that Plaintiff is entitled to summary judgment as a matter of law.

## IV. CONCLUSION

For the reasons set forth above, this Court finds that Plaintiff has sufficiently demonstrated a right to recovery of the unpaid royalties as well as Mr. Doyle's auditing fees. This Court further finds that Defendant has failed to properly challenge Plaintiff's showing by identifying a material issue of fact for trial. This Court must therefore find that summary judgment in favor of Plaintiff is proper. Accordingly, Plaintiff's Motion for Summary Judgment is hereby GRANTED. Plaintiff is further awarded Judgment in the amount of $92,554.54.

An Order and Judgment consistent with this Memorandum Opinion will be filed contemporaneously herewith.

### ORDER AND JUDGMENT

For the reasons set forth in the Court's Memorandum Opinion filed contemporane-

---

**10.** The fact that Mr. Doyle's conclusion were not drawn directly from Defendant's records has no impact on the accuracy of Plaintiff's calculations as to royalties. As already noted, the damages that Plaintiff seeks to recover were not based on Mr. Doyle's calculations, but rather, were drawn from the figures given by Mr. Allen, of Timeless Bedding, Inc., to Mr. Skaling.

ously herewith, it is hereby ORDERED, ADJUDGED, AND DECREED THAT Plaintiff Springwall Inc.'s Motion for Summary Judgment is GRANTED. Plaintiff is therefore awarded Judgment against Defendant Timeless Bedding, Inc. in the amount of $92,554.54.