133 P.3d 796

Ryan YONEDA, Plaintiff–Appellant,

v.

Andrew TOM and Sports Shinko (Mililani) Co., Ltd., Defendants–Appellees,

and

John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; Roe "Non–Profit" Corporations 1–10; and Roe Governmental Entities 1–10, Defendants.

No. 26271.

Supreme Court of Hawai'i.

April 28, 2006.

Reconsideration Denied May 18, 2006.

James Y. Agena and Scott E. Kubota, Honolulu, (of Koshiba, Agena & Kubota), on the briefs, for plaintiff-appellant.

Lorrin A. Kau, Honolulu, on the briefs, for defendant-appellee Andrew Tom.

Sidney K. Ayabe, Zale T. Okazaki, and Steven L. Goto, (Honolulu, of Ayabe, Chong, Nishimoto, Sia & Nakamura), on the briefs, for defendant-appellee Sports Shinko (Mililani) Co., Ltd.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by MOON, C.J.

Plaintiff-appellant Ryan Yoneda appeals from the Circuit Court of the First Circuit's [1] November 14, 2003 first amended judgment, entered pursuant to orders granting summary judgment in favor of defendants-appellees Andrew Tom and Sports Shinko (Mililani) Co., Ltd. (Sports Shinko) [hereinafter, collectively, the defendants]. Briefly stated, this personal injury action arose out of an accident involving Yoneda, who was struck in the left eye by an errant golf ball that was hit by Tom. At the time of the accident, both

1. The Honorable Dexter D. Del Rosario presided over this matter.

Yoneda and Tom were golfing, in separate groups, at the Mililani Golf Course, owned and operated by Sports Shinko. Essentially, Yoneda contends that the circuit court erred in granting the defendants' motions for summary judgment by (1) applying the assumption of risk doctrine to bar his negligence claim against Tom and (2) applying the assumption of risk doctrine to bar his negligence, product liability, and breach of warranty claims against Sports Shinko.

For the reasons more fully discussed *infra*, we vacate that portion of the circuit court's November 14, 2003 first amended final judgment entered in favor of Sports Shinko and remand this case for further proceedings consistent with this opinion. We affirm that portion of the amended final judgment entered in favor of Tom.

## I. BACKGROUND

### A. Factual Background

On August 20, 1999, Yoneda was playing golf with his four companions at the Mililani Golf Course. Prior to the incident, Yoneda and his group were finishing their play on the green of the fifth hole. Upon completing their play, Yoneda and his group walked to their golf carts at the edge of the green and drove toward the sixth hole tee-off area, staying on the designated cart path. Yoneda was a passenger in one of the golf carts.

The Mililani Golf Course rules required all golf carts to stay on the designated paved-cart paths while heading from the green to the next tee-off area. According to the description in the record, the cart path from the fifth hole green to the sixth hole tee box looped in a "U-turn" behind a restroom building. After emerging from behind the restroom area, the cart path became a straight-away leading to the sixth hole tee off area.

Tom, who was playing in a foursome immediately behind the Yoneda group, had apparently teed-off from the fifth tee, and was waiting in the fairway for Yoneda's group to clear the fifth hole green area before continuing to play. Tom was about 175 yards away from the hole when he hit his approach shot to the fifth hole green. The ball, however, took flight in an unintended direction. The ball hit the left side of the fairway, bounced into the rough, bounced again on the dirt area, then bounced onto the cart path, sending the ball towards the golf cart in which Yoneda was seated. Yoneda was struck in the left eye as his golf cart emerged from behind the restroom building.

Yoneda testified that he did not hear any warning before he was hit. Tom admitted that he never yelled "fore"[2] or otherwise gave any warning to Yoneda, nor to anyone else, that he had hit an errant shot. He also testified that, because the golf course's design (*i.e.*, carts being routed behind the restroom building) prevented him from seeing the cart, he did not yell any warning of the errant shot.

Yoneda was subsequently rushed to Saint Francis Medical Center West for emergency medical treatment. As a result of the incident, Yoneda allegedly sustained serious personal injuries to his left eye, including permanent loss of peripheral vision, permanent pupil dilation, blurred vision, difficulty focusing, angel recision glaucoma, traumatic ecchymosis, and retinal edema.

### B. Procedural Background

On August 10, 2001, Yoneda filed a complaint against the defendants, alleging that the acts or omissions of the defendants caused injury to him. A first amended complaint, however, was filed on January 29, 2002, apparently to correct defendant Tom's name from "Albert Tom" to "Andrew Tom." Yoneda's complaint alleged: (1) negligence, gross negligence, breach of express or implied warranties and/or strict liability (Count I); (2) premises liability (Count II); and (3) negligent failure "to provide safe rental carts for use on the premises as designed, maintained, and controlled" (Count III). The complaint was unclear as to whom the claims were asserted against. During his deposition, however, Yoneda admitted that his only claim against Tom was negligence in failing

---

**2.** It appears to be common knowledge among golfers that golf etiquette requires that a player shout "fore" as a warning when his or her shot may endanger another player.

to make sure the landing area was clear before hitting the ball and in failing to give a warning of the errant shot. As to Sports Shinko, Yoneda alleged that Sports Shinko: (1) is strictly liable for the defective design of its golf course, which (a) required golfers, following the laid-out cart path, to face oncoming shots without adequate or reasonable protection and (b) prevented Tom from seeing anyone near or approaching the vicinity of his errant shot; (2) negligently failed to provide safe rental carts for use on the premises by failing to equip them with windshields; and (3) had a special relationship with Yoneda, as an invitee, and, thus, was required to take greater care by placing warning signs or safety netting to minimize the risk that golfers will be hit by golf balls.

Tom and Sports Shinko answered the complaint and filed cross-claims against each other. By November 4, 2002, all parties had filed their pretrial statements. On October 24, 2002, Tom filed a motion for summary judgment, requesting dismissal of all claims based on the assumption of risk defense. Thereafter, on December 20, 2002, Sports Shinko filed a substantive joinder to Tom's motion for summary judgment, seeking dismissal of all claims on the grounds that: (a) Yoneda voluntarily assumed the risk by participating in golfing activities; (b) Sports Shinko was not grossly negligent; and (c) there is no evidence that Sports Shinko's golf course or golf carts were defectively designed. The defendants essentially contended that, because the negligence claims involved a sport-related accident, the implied assumption of risk completely barred Yoneda's claims, relying upon *Foronda v. Hawai'i International Boxing Club*, 96 Hawai'i 51, 25 P.3d 826 (App.2001), *cert. denied*, 96 Hawai'i 51, 25 P.3d 826 (2001).

Yoneda filed oppositions to both Tom's motion and Sports Shinko's substantive joinder on December 30, 2002 and January 6, 2003, respectively. Yoneda argued that the implied assumption of risk was abolished as a defense by this court in *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 837 P.2d 1273 (1992). He further maintained that the following were disputed questions of fact that could not be decided as a matter of law: (1)

whether being struck by a golf ball was an "inherent risk" of golf; (2) whether Tom increased the risk of injury by his conscious and reckless failure to warn Yoneda of his errant shot; and (3) whether Sports Shinko increased the risk of injury by its defective designs of the golf course and golf cart. Yoneda, relying upon Restatement (Second) of Torts § 314A (1965), quoted *infra*, also argued that, because Sports Shinko, as possessor of land, has a special relationship with him, as invitee, it cannot evade the higher duty of care it owned to him by relying on the assumption of risk defense.

A hearing was held on January 8, 2003, wherein the circuit court entertained both motions for summary judgment. At the conclusion of the hearing, the court indicated that:

> With respect to defendant Tom, the court is in agreement with [Tom's] position and persuaded by the points and authorities cited in [the] memorandum. For that reason[,] the court is going to grant the motion for summary judgment.
>
> With respect to Sports Shinko's motion, the court is going to take that under advisement. And after our recess[,] I would like to have an opportunity to meet with counsel in chambers regarding this matter.

Ultimately, the circuit court, on January 21, and 22, 2003, issued its written orders granting summary judgment in favor of Tom and Sports Shinko, respectively.

On April 1, 2003, Yoneda appealed the March 3, 2003 judgment. This court, however, dismissed the appeal on August 5, 2003 for lack of appellate jurisdiction because the final judgment "fail[ed] to state that the judgment in favor of defendant Sports Shinko is a judgment on all of [Yoneda's] claims against Sports Shinko." A first amended final judgment was then entered on November 14, 2003. Therein, the circuit court entered judgment in favor of the defendants and dismissed the defendants' cross-claims as moot. On December 9, 2003, Yoneda timely filed his notice of appeal in the instant case.

## II. *STANDARD OF REVIEW*

The standard of review regarding a grant of summary judgment is well established:

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the interferences drawn therefrom in the light most favorable to the party opposing the motion.

*Querubin v. Thronas*, 107 Hawai'i 48, 56, 109 P.3d 689, 697 (2005) (citations omitted) (brackets in original). "We review an award of summary judgment under the same standard applied by the circuit court." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22 (1992). We, therefore, review the record *de novo*. *Yamagata v. State Farm Mut. Auto. Ins. Co.*, 107 Hawai'i 227, 229, 112 P.3d 713, 715 (2005) ("We review the circuit court's grant or denial of summary judgment *de novo*." (Citation omitted.)). Under the *de novo* standard, "we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *Chun v. Bd. of Trs. of Employees' Ret. Sys.*, 92 Hawai'i 432, 439, 992 P.2d 127, 134 (2000) (internal quotation marks and citations omitted).

### III. DISCUSSION

The parties do not dispute the essential facts of this case with respect to the circumstances that led to Yoneda's injury. The dispositive issue on appeal is whether the assumption of risk doctrine applies and, if so, whether Yoneda's claims against the defendants are barred as a matter of law.

### A. The Assumption of Risk Doctrine

#### 1. An Overview of the Doctrine

In *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 837 P.2d 1273 (1992),[3] this court

delineated two components of the assumption of risk doctrine, *i.e.*, "express" and "implied" assumption of risk. *Id.* at 35, 837 P.2d at 1290. Express assumption of risk involves an express waiver or release, as by contract or written waiver. *Id.* Inasmuch as the instant case does not involve any express waiver or release, our discussion is focused upon the second component—implied assumption of risk.

In *Larsen*, this court stated:

Implied assumption of risk has been used in the context of negligence cases to describe two distinct theories under which a defendant may avoid liability. The **"primary" sense of implied assumption of risk** emerged, along with the global doctrine itself, out of the common law action of a servant against his master. Used in its primary sense, assumption of risk **describes the act of a plaintiff, who has entered voluntarily and reasonably into some relation with a defendant, which plaintiff knows to involve the risk.** It is an alternative expression of the proposition that a defendant owes no duty to a plaintiff. . . .

**In its "secondary" sense, implied assumption of risk focuses on a plaintiff's conduct, and describes a situation where plaintiff knows of the danger presented by a defendant's negligence and proceeds voluntarily and unreasonably to encounter it.** A plaintiff's assumption of risk is unreasonable, and a form of contributory negligence, where the known risk of harm is great relative to the utility of plaintiff's conduct. **It is implied assumption of risk in this secondary sense, *i.e.*[,] unreasonable assumption of risk, that has been merged with comparative negligence by the decisions of this court in products liability cases.**

We conclude that express assumption of risk survives the merger with comparative negligence in products liability cases and hold that express assumption of risk is

---

**3.** *Larsen* is a product liability action brought by the recipient of a heart pacemaker against the manufacturer as a result of complications due to possible malfunction. The pacemaker was eventually removed from the recipient when it was recalled by the manufacturer.

available as a separate defense that may bar plaintiff's recovery in tort and warranty strict products liability actions. Express assumption of risk is essentially contractual in nature and does not conflict with the basic concept of apportionment under comparative fault involving negligence.

*Id.* at 35–36, 837 P.2d at 1290–91 (bold emphases added) (citations and other emphasis omitted). With respect to implied assumption of risk, however, this court noted that the application of *primary* implied assumption of risk is absurd in the context of "implied warranty and strict products liability tort actions":

> The concept of reasonable primary implied assumption of risk makes sense in the products liability context under one set of circumstances—where plaintiff is injured while reasonably using a product that is *not defective*, e.g., plaintiff has reasonably assumed the risk of being cut while using an ordinary knife. However, as applied to a *defective* product, the concept is absurd; if a plaintiff is injured while reasonably using a defective product, a defendant should not be relieved of liability. Indeed, a defective product is one that causes injury when it is used in a reasonable manner, and the tort and implied warranty doctrines of products liability were designed to compensate plaintiffs for these very injuries. We therefore decline to retain the concept of reasonable primary implied assumption of risk where it unnecessarily duplicates the "defect" analysis and has the clear potential to generate confusion and error.

*Id.* at 38, 837 P.2d at 1292 (emphases in original). The *Larsen* court then concluded that secondary implied assumption of risk was subsumed in, and therefore merged with, the concept of comparative negligence:

> To the extent that there may be unreasonable primary implied assumption of risk, we find that the policy it represents—the notion that no duty is owed—has been rendered invalid by the merger of comparative negligence and implied assumption of risk. We consequently hold that in implied warranty and strict products liability

tort actions, the concept of primary implied assumption of risk is abolished, and [**secondary**] **implied assumption of risk provides a defense to liability only when plaintiff's "assumption of risk" is a form of contributory negligence.**

*Id.* at 38–39, 837 P.2d at 1292 (emphasis added) (footnote and citations omitted). Thus, by its declaration in *Larsen*, this court has joined

> those courts that have abolished primary implied assumption of risk *in strict products liability and implied warranty actions for personal injury* and have retained secondary implied assumption of risk solely as a form of contributory negligence to be compared against defendant's fault.

*Id.* at 37, 837 P.2d at 1291 (emphasis added). Inasmuch as the case before us involves an action for personal injury resulting from being hit in the eye by an errant golf ball, we next examine the implied assumption of risk doctrine in the context of recreational sports in general and golfing in particular.

### 2. Recreational Sporting Events and the Implied Assumption of Risk Doctrine

#### a. *Hawai'i case law*

In *Foronda v. Hawai'i International Boxing Club*, 96 Hawai'i 51, 25 P.3d 826 (App. 2001), the Intermediate Court of Appeals (ICA) recognized that *Larsen's* "cabined rationale and holding" essentially "eliminated primary implied assumption of risk as a discrete defense *only* in the product liability context." *Id.* at 60, 25 P.3d at 835 (emphasis added). The ICA further noted that *Larsen* clearly acknowledged that primary implied assumption of risk has been seen in a "case in which a plaintiff has been injured as a natural incident of engaging in a contact sport. It may also be seen in the act of a spectator entering a baseball park, thereby consenting that the players proceed without taking precautions to protect her from being hit by the ball," *id.* at 59, 25 P.3d 826, 25 P.3d at 834 (quoting *Larsen*, 74 Haw. at 36–37, 837 P.2d at 1291), and that such reference "indicates that the doctrine retains its essen-

tial vitality there." [4] *Id.* at 60, 837 P.2d 1273, 25 P.3d at 835.

In *Foronda,* a boxer, while sparring, fell through the ropes of the boxing ring to the concrete flooring, striking his head, and died. *Id.* at 54–55, 25 P.3d at 829–30. Consequently, the parents of the deceased boxer filed a complaint against an amateur boxing club and the boxing ring's owner and operator for causing their son's death. The parents alleged that their son's death was the result of negligent construction, maintenance, and lack of supervision of the boxing ring. The court held that "[p]rimary implied assumption of risk is *a discrete and complete defense* where the defendant's conduct at issue is **an inherent risk** of *the sports activity.*" *Id.* at 66, 25 P.3d at 835, 841 (emphases added) (footnote omitted). The ICA explained that:

> The doctrine has been divided into several categories but as the term applies to sporting events it involves what commentators call "primary" assumption of risk. Risks in this category are incidental to a relationship of free association between the defendant and the plaintiff in the sense that either party is perfectly free to engage in the activity or not as he wishes. *Defendant's duty under such circumstances is a duty to exercise care to make the conditions as safe as they appear to be. If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty. Plaintiff's "consent" is not constructive consent; it is actual consent implied from the act of the electing to participate in the activity.* When thus analyzed and applied, assumption of risk is not an absolute defense but a measure of the defendant's duty of care[.]

*Id.* at 62, 25 P.3d at 837 (quoting *Turcotte v. Fell,* 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502

N.E.2d 964, 968 (1986)) (emphasis added). The inquiry into what constitutes an inherent risk "is *an objective one,* and must be, for the vagaries of prior knowledge or perception of risk would undermine the doctrine's underlying policy[ ] that the law should not place unreasonable burdens on the free and vigorous participation in sports[.]" *Id.* at 67, 25 P.3d at 842 (emphasis added) (internal quotation marks and citation omitted).

"[T]he defense applies to those injury-causing events which are known, apparent or reasonably foreseeable consequences of the participation[,] except for acts which are reckless or intentional." *Id.* at 62, 25 P.3d at 837 (citation and internal quotation marks omitted) (some brackets in original).

> In determining whether the defendant's conduct is an inherent risk of the sports activity, *we consider the nature of the activity, the relationship of the defendant to the activity and the relationship of the defendant to the plaintiff. A defendant may be held liable to the plaintiff for creating or countenancing risks other than risks inherent in the sport, or for increasing inherent risks, and in any event will be held liable for reckless[ ] or intentional[ ] injurious conduct totally outside the range of ordinary activity involved in the sport,* but liability should not place unreasonable burdens on the free and vigorous participation of the sport.

*Id.* at 66, 25 P.3d at 841 (emphasis added). Applying the above standard to the defendant boxing ring owner and operator, the *Foronda* court determined, *inter alia,* that (1) the risk of falling between boxing ring ropes was an inherent risk of the sport of amateur boxing and (2) the evidence was insufficient to show that the owner or operator had increased the risk of the sport be-

---

4. The *Foronda* court further explained that:
 Shortly after *Larsen* was decided, the United States [D]istrict [C]ourt for the [D]istrict of Hawai'i, in *Tancredi v. Dive Makai Charters,* 823 F.Supp. 778 (D.Haw.] 1993), *overrul[ed] on other grounds recognized by, McClenahan v. Paradise Cruises, Ltd.,* 888 F.Supp. 120 (D.Haw.] 1995), a diving fatality case, discussed *Larsen* and concluded that *"[t]he Hawai'i Supreme Court has not yet addressed implied assumption of risk, either secondary or*

*primary, in the context of recreational sports."* *Id.* at 788 (footnote omitted). Because it was sitting in diversity, the federal court exercised its "best judgment in predicting" that "the Hawai'i Supreme Court would allow the defense [of primary implied assumption of risk] in an appropriate sports-related case." *Id.* (citation and internal quotation marks omitted). *Id.* at 60, 25 P.3d at 835 (some brackets in original) (emphasis added).

yond the inherent risk. With respect to the alleged defective ring,—that is, the fact that two "spacer ties" were looped around the ropes and taped rather than tied, as well as the lack of padding on the floor outside the ring,—the court noted, *inter alia*, that "[t]he undisputed evidence before the circuit court showed that no specific standards existed for amateur sparring or practice sessions[,]" and it appeared that, in renovating and maintaining the ring, the defendants reduced rather than increased the risks inherent in the sport. *Id.* at 68, 25 P.3d at 843. Accordingly, the court concluded that the looping and taping of the spacer ties and the lack of padding on the floor outside the ring, "whether negligent or not, did not create *a new risk or increase the inherent risk* of sparring, and hence, cannot negate [the defense of] assumption of risk." *Id.* at 69, 25 P.3d at 844 (emphasis added).

Clearly, Yoneda's contention that (1) *Larsen* abolished the defense as to all types of cases, including negligence cases and that, therefore, (2) the circuit court erred in agreeing with the defendants that *Foronda* took precedence over *Larsen* where the negligence claims involved a sport related action is unfounded. The expressed narrow holding of *Larsen* and the ICA's ruling in *Foronda* that "primary implied assumption of risk remains a discrete and complete defense in sports injury cases[,]" 96 Hawai'i at 61, 25 P.3d at 836, are controlling.

### b. *increasing the inherent risk: California case law*

In the absence of Hawai'i case law, the court in *Foronda* examined the law in other jurisdictions, including California, addressing the application of the doctrine of assumption of risk in the context of recreational sports. *See Foronda*, 96 Hawai'i at 58–66, 25 P.3d at 833–41. We believe that a discussion of some of the cases relied upon by the ICA in

*Foronda*, as well as other California cases, is warranted here.

We begin with the general rule that a business owner owes a duty to an invitee to exercise ordinary care for the invitee's safety and protection. *See Doe v. Grosvenor Props. (Hawai'i) Ltd.*, 73 Haw. 158, 162–65, 829 P.2d 512, 514–16 (1992); *Wolsk v. State*, 68 Haw. 299, 301, 711 P.2d 1300, 1301 (1986). Restatement (Second) of Torts § 314A (1965) provides:

> (1) A common carrier is under a duty to its passengers to take reasonable action
>
> (a) to protect them against unreasonable risk of physical harm, and
>
> (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
>
> (2) An innkeeper is under a similar duty to his guests.
>
> (3) *A possessor of land who holds it open to the public is under a similar duty to members of the public who enter in response to his invitation.*
>
> (4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other.

(Emphasis added.)[5] A business owner's duty includes a duty to warn an invitee of latent or concealed defects, of which the owner knows or should have knowledge. *Kole v. AMFAC, Inc.*, 69 Haw. 530, 533, 750 P.2d 929, 931 (1988). A business owner is not an insurer of the invitee's safety, but does have a duty to exercise reasonable care to protect against unreasonable risks of foreseeable harm. *Gelber v. Sheraton–Hawai'i Corp.*, 49 Haw. 327, 329, 417 P.2d 638, 639 (1966).

In a sports context, however, conditions or conduct that otherwise might be interpreted

---

5. The "special relationship" set forth in section 314A(3), *i.e.*, the "invitee exception," is further explained by the Restatement (Second) of Torts § 332 (1965) as follows:

(1) An invitee is either a public invitee or a business visitor.

(2) A public invitee is a person who is invited to enter or remain on land as a member of the

public for a purpose for which the land is held open to the public.

(3) A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.

as unreasonably dangerous are often an integral part of the sporting activity, *i.e.*, an inherent risk. *See Bundschu v. Naffah*, 147 Ohio App.3d 105, 768 N.E.2d 1215, 1222 (2002) (an errant golf ball deflected back into the participant's playing field on a golf driving range is considered part of the inherent risks of the sport). For example, the California Supreme Court in its leading, well-regarded opinion in *Knight v. Jewett*, 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696 (1992), observed that, "although moguls[, which are "bump[s] or mound[s] of hard snow," The Random House College Dictionary 858 (1979 rev. ed.),] on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them." *Id.* at 708 (citation omitted). Thus, "[e]ven where the plaintiff, who falls while skiing over a mogul, is a total novice and lacks any knowledge of skiing whatsoever, the ski resort would not be liable for his or her injuries." *Id.* at 709. In this respect, the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant-owner. The *Knight* court further explained that:

> Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, *it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport.* Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes [ (used in the operation of its ski lifts) ] in a safe, working condition so as not to expose skiers to an increased risk of harm. The cases establish that the latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant.

*Id.* at 708 (citation omitted) (emphasis added). Thus, "even where the plaintiff actually is aware that a particular ski resort on occasion has been negligent in maintaining its towropes, that knowledge would not preclude the skier from recovering if he or she were injured as a result of the resort's repetition of such deficient conduct." *Id.* at 709. In other words, although the plaintiff may have acted with the knowledge of the potential negligence, he or she did not consent to such negligent conduct or agree to excuse the resort from liability in the event of such negligence. Accordingly, the *Knight* court held that, "[r]ather than being dependent on the knowledge or consent of the particular plaintiff, *resolution of the question of the defendant's liability ... turns on whether the defendant had a legal duty to avoid such conduct or to protect the plaintiff against a particular risk of harm.*" *Id.* (emphasis added).

Nevertheless, because *Knight* dealt with a defendant who was a participant in a touch football game in which the plaintiff was engaged at the time of her injury, the court went further to determine the liability between co-participants. The court concluded that it was improper to hold a sports participant liable to a co-participant for ordinary careless conduct committed during the sport, but that liability properly may be imposed on a participant when he or she intentionally injures another player or engages in reckless conduct that is totally outside the range of the ordinary activity involved in the sport. *Id.* at 710. The court explained that,

> in the heat of an active sporting event like baseball or football, a participant's normal energetic conduct often includes accidentally careless behavior. . . . [V]igorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct. . . . [I]n such a sport, even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule.

*Id.* (emphasis in original). Consequently, the court concluded that inherent in an "active" sport, such as touch football or baseball, is a

risk one player will injure another through careless or negligent play and that those risks are subsumed under primary assumption of risk.

Several years after *Knight,* the California Court of Appeals had occasion to flesh out the theory of primary implied assumption of risk in *Bushnell v. Japanese–American Religious and Cultural Ctr.,* 43 Cal.App.4th 525, 50 Cal.Rptr.2d 671 (1996). In *Bushnell,* a student of judo (the plaintiff) was practicing a routine with his instructor at a judo club. After running through the routine two dozen times at increasing speeds, the student, with the instructor as his partner, tripped and broke his leg. The plaintiff sued the judo club, claiming that it was liable for the negligence of its instructor. He alleged that the speed with which he was led through the routine was excessive.

Because the judo club was named as a defendant, the *Bushnell* court had the opportunity to revisit *Knight*—a case decided only with respect to co-participants in the sport and not sport facility owners. In so doing, the court enunciated a general rule applicable in all cases and to all defendants:

> [I]n all cases[,] the nature of the activity, the relationship of the defendant to the activity and the relationship of the defendant to the plaintiff must be examined. *It must then be determined, in light of the activity and these relationships, whether the defendant's conduct at issue is an "inherent risk" of the activity such that liability does not attach as a matter of law. General rules of liability attach when the defendant's conduct is not an inherent risk of the activity or when the defendant's conduct increased the inherent risks in the activity. A defendant also may be charged with the duty to take such precautions as will prevent the risk without having a chilling effect on the nature of the activity.*

*Id.* at 674 (emphasis added). Thus, the *Bushnell* court held that repetitive training at increasing speed is an inherent part of the sport such as judo. The court explained that:

> Instruction in an activity such as judo necessarily requires pushing a student to move more quickly, attempt a new move, or take some other action that the student previously may not have attempted. That an instructor might ask a student to do more than the student can manage is an inherent risk of the activity. *Absent evidence of recklessness, or other risk-increasing conduct, liability should not be imposed simply because an instructor asked the student to take action beyond what, with hindsight, is found to have been the student's abilities. To hold otherwise would discourage instructors from requiring students to stretch, and thus to learn, and would have a generally deleterious effect on the sport as a whole.*

*Id.* at 675 (emphasis added). Accordingly, the California Court of Appeals has adhered to the principle that "[a] risk is inherent in a sport if its elimination (1) would chill vigorous participation in the sport[ ] and (2) would alter the fundamental nature of the activity." *Sanchez v. Hillerich & Bradsby Co.,* 104 Cal.App.4th 703, 128 Cal.Rptr.2d 529, 536 (2002) (citing *Ferrari v. Grand Canyon Dories,* 38 Cal.Rptr.2d 65, 67–8 (Cal.Ct.App. 1995)).

In the context of the sport of golf, the California Court of Appeals, in *Dilger v. Moyles,* 54 Cal.App.4th 1452, 63 Cal.Rptr.2d 591 (Cal.Ct.App.1997), specifically explained that:

> While golf may not be as physically demanding as other more strenuous sports such as basketball or football, risk is nonetheless inherent in the sport. *Hitting a golf ball at a high rate of speed involves the very real possibility that the ball will take flight in an unintended direction. If every ball behaved as the golfer wished, there would be little "sport" in the sport of golf. That shots go awry is a risk that all golfers, even the professionals, assume when they play.*
>
> *Holding participants liable for missed hits would only encourage lawsuits and deter players from enjoying the sport.* Golf offers many healthful advantages to both the golfer and the community. The physical exercise in the fresh air with the smell of the pines and eucalyptus renews the spirit and refreshes the body. The

sport offers an opportunity for recreation with friends and the chance to meet other citizens with like interests. A foursome can be a very social event, relieving each golfer of the stresses of business and everyday urban life. Neighborhoods benefit by the scenic green belts golf brings to their communities, and wild life enjoy and flourish in a friendly habitat. Social policy dictates that the law should not discourage participation in such an activity whose benefits to the individual player and to the community at large are so great.

*Id.* at 593 (footnote omitted) (emphases added); *see also Am. Golf Corp. v. Superior Court of Los Angeles County,* 79 Cal.App.4th 30, 93 Cal.Rptr.2d 683 (2000); *Bundschu v. Naffah,* 147 Ohio App.3d 105, 768 N.E.2d 1215 (2002); *Neumann v. Shlansky,* 58 Misc.2d 128, 294 N.Y.S.2d 628, 635 (N.Y. 1968) (declaring that "a golf ball is a dangerous missile capable of inflicting grievous harm no matter who hits it").

Additionally, a year before *Bushnell,* the California Court of Appeals had an opportunity to apply the *Knight* principles to golfing activities and, in particular, to the owner and operator of a golf course. The court in *Morgan v. Fuji Country USA, Inc.,* 34 Cal. App.4th 127, 40 Cal.Rptr.2d 249 (1995), declared that the duty owed by a golf course owner to a golfer is to provide a reasonably safe golf course. *Id.* at 253. This duty requires the golf course owner

> to minimize the risk that players will be hit by golf balls, *e.g.,* by the way the various tees, fairways and greens are aligned or separated. In certain areas of a golf course, because of the alignment or separation of the tee[s], fairway[s] and/or greens, the golf course owner may also have a duty to provide protection for players from being hit with golf balls where the greatest danger exists and where such an occurrence is reasonably to be expected[.]

*Id.* (citation and internal quotation marks omitted). However, as the court in *Knight* held, sport facility owners/operators "generally have no legal duty to eliminate (or protect a [participant] against) risks inherent in the sport itself ... [but] do have a duty to

use due care not to increase the risks to a participant over and above those inherent in the sport." *Knight,* 11 Cal.Rptr.2d 2, 834 P.2d at 708.

In *Morgan,* the plaintiff-golfer was a member of the defendant-golf course and golfed two to three times per week. The plaintiff asserted that he observed (1) golf balls hit from the fourth tee fly over the large pine tree (located near the area of the fifth tee) and land on either the fifth tee or the adjacent fifth green and (2) many times balls hit from the fourth tee get caught in the boughs of the tree. He testified that, to protect himself from flying golf balls, he "would routinely stand underneath this particular [large pine] tree if other golfers ahead of him had not yet cleared the fifth tee area." *Id.* at 250. A few months prior to plaintiff's accident, the golf course owner removed the tree because it became diseased. After the removal of the tree, the plaintiff testified that he saw at least four golf balls hit from the fourth tee almost strike golfers who were standing on the fifth tee box. He stated that "the balls hit from the fourth tee traveled farther after [the defendant] removed the tree[,]" presumably because golf balls would previously have been deflected or caught in the branches. *Id.* On the day of the accident, the plaintiff walked from the fifth tee box to a bench alongside the cart path to return to his golf cart and bag after he had finished his turn. While putting away his club, the plaintiff was hit on the head by an errant golf ball hit from the fourth tee. The ball had bounced on the cart path before hitting the plaintiff. When the ball hit the plaintiff, he was standing on the cart path in front of the bench where he had left his golf bag, which was located near the fifth tee.

Subsequently, the plaintiff sued the golf course for damages on the grounds of negligence, as well as premises and landowner's liability. The trial court granted summary judgment in favor of the golf course on the basis that primary assumption of risk operated as a complete bar to the plaintiff's claims. On appeal, the California Court of Appeals reversed the trial court's order, concluding that the case was one involving secondary assumption of risk. *Id.* at 253 (noting, how-

ever, that "if the relationship between the parties was one of co-participants, *i.e.*, if the defendant here were the golfer who hit the errant ball, this would clearly be a primary assumption of the risk case under *Knight* and the defendant would have no liability towards [the plaintiff] because there is an inherent risk that the defendant would hit an errant ball"). The court determined that the evidence that the area of the fifth tee was a particularly dangerous place, due to the design of the fourth and fifth tees and the removal of the diseased tree, could support a finding that the golf course owner breached the duty of care owed to the plaintiff. *Id.*; *see also Saffro v. Elite Racing, Inc.*, 98 Cal. App.4th 173, 119 Cal.Rptr.2d 497 (2002) (holding that secondary assumption of risk applies to a suit between a marathon runner, who suffered epileptic seizure after a race, and the race organizer, who had a duty to minimize the risks of dehydration and hyponatremia by providing adequate water and electrolyte fluids along the 26–mile course).

Similarly, the California Court of Appeals in *Branco v. Kearny Moto Park, Inc.*, 37 Cal.App.4th 184, 43 Cal.Rptr.2d 392 (1995), applied the secondary assumption of risk doctrine to preclude summary judgment in favor of the owners of a bicycle moto cross (BMX) course, which consists of bumps, jumps, turns, straight-aways, and obstacles. In that case, a bicycle racer (the plaintiff) sought damages from a corporation and its officers, which owned the property used for the BMX course, for injuries incurred while executing a jump.

The court first noted that:

It is not unreasonable to expect a BMX course to refrain from utilizing jumps which by design create an extreme risk of injury. Certainly the jumps, and falls, are inherent to the sport, and[,] under the doctrine of primary assumption of risk, there is no duty to eliminate the jumps entirely, and no duty to protect from injury arising from reasonably designed jumps.

*Id.* at 398. However, the court held that:

[T]he sport does not inherently require jumps which are designed in such a way as to create an extreme risk of injury.

Accordingly, premised on the duty not to utilize dangerously designed jumps, this case falls under the secondary assumption of risk category, and issues pertaining to [the plaintiff's] comparative fault are for the trier of fact to decide. [The plaintiff's] expert's opinions regarding the design of the jump create a triable issue of material fact whether [the jump] was designed in such a way as to create an extreme risk of injury.

*Id.* (emphasis added) (footnotes omitted).

More recently, the California Court of Appeals has stated that:

If the plaintiff fails to show any increase in the inherent risks, or if the trial court determines that the only risk encountered were inherent in the sport, the defendant prevails based on primary assumption of risk. If the jury, properly instructed on the scope of the defendant's duty, determines the defendant did increase the inherent risk, it then considers the plaintiff's claim based on secondary assumption of risk as an aspect of the plaintiff's comparative fault. This second determination of duty, however, still hinges upon the trial court's determination of the question of duty in the first instance, by defining the risks inherent in the sport at issue.

*Vine v. Bear Valley Ski Co.*, 118 Cal.App.4th 577, 13 Cal.Rptr.3d 370, 382 (2004) (citations, internal quotation marks, and footnote omitted) (emphasis added); *see, e.g., Am. Golf Corp.*, 93 Cal.Rptr.2d at 683 (rejecting the plaintiff's contention that his case fell under the secondary assumption of risk doctrine, thereby, entitling him to a jury trial on the issue of comparative fault, where the plaintiff had not proved that the golf course owner's placement of yardage markers increased the inherent risk of players being struck by a golf ball that ricocheted off a marker). Thus, although primary assumption of risk operates as a complete bar to liability—after all, without duty, there can be no liability—secondary assumption of risk is simply part of the comparative negligence doctrine, in which "both a defendant's breach of a legal duty to the plaintiff and the plaintiff's voluntary decision to engage in an unusually risky sport" are weighed by the jury to reach an

equitable apportionment of fault. *Knight*, 11 Cal.Rptr.2d 2, 834 P.2d at 707; *Vine*, 13 Cal.Rptr.3d at 384. Keeping these foregoing principles in mind, we now turn to the dispositive issues presented by this appeal.

B. *The Grant of the Defendants' Motions for Summary Judgment*

As previously indicated, the specific inquiries before this court are: (1) whether being hit by a golf ball is an inherent risk of recreational golf; and (2) whether the assumption of risk doctrine bars (a) Yoneda's negligence claim against Tom and (b) Yoneda's negligence, product liability, and breach of warranty claims against Sports Shinko so as to warrant summary judgment in favor of the defendants.

1. The Inherent Risk in Golf

■ Whether a duty exists depends on whether the activity in question was an "inherent risk" in the sport. Based on our discussion *supra*, we hold that there is an inherent risk that golf participants will be hit by errant shots. *See Dilger*, 63 Cal.Rptr.2d at 593; *Am. Golf Corp.*, 93 Cal.Rptr.2d at 689; *Bundschu*, 768 N.E.2d at 1222.

2. **Assumption of Risk as Applied to Tom**

Although *Foronda* was not a co-participant case, the ICA recognized the reasoning of the *Knight* court that

a participant in an active sport breaches a legal duty of care to other participants— *i.e.*, engages in conduct that properly may subject him or her to financial liability— *only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity in the sport.*

*Foronda*, 96 Hawai'i at 65, 25 P.3d at 840 (quoting *Knight*, 11 Cal.Rptr.2d 2, 834 P.2d at 711). In applying the principle of *Knight*, the California courts have specifically adopted different standards for the co-participant as opposed to the owner of a recreational facility. The co-participant is liable only for intentional or reckless conduct. *Dilger*, 63 Cal.Rptr.2d at 594 (applying the reck-

lessness or intentional conduct standard of care to golf); *Mark v. Moser*, 746 N.E.2d 410 (Ind.Ct.App.2001) (applying the standard to a triathlon); *Ritchie–Gamester v. City of Berkley*, 461 Mich. 73, 597 N.W.2d 517 (1999) (applying the standard to an ice skating collision); *Thompson v. McNeill*, 53 Ohio St.3d 102, 559 N.E.2d 705 (1990) (applying the standard to golf); *Dotzler v. Tuttle*, 234 Neb. 176, 449 N.W.2d 774 (1990) (applying the standard to a pick-up basketball game); *Connell v. Payne*, 814 S.W.2d 486 (Tex.App.1991) (applying the standard to a polo match).

Two important considerations support the decision to apply a standard of care that exceeds negligence, that is, the reckless and intentional conduct standard of care: (1) the promotion of vigorous participation in athletic activities; and (2) the avoidance of a flood of litigation generated by participation in recreational games and sports. *See Mark*, 746 N.E.2d at 419. As the New Jersey Supreme Court, in *Schick v. Ferolito*, 167 N.J. 7, 767 A.2d 962 (N.J.2001), explained:

Our conclusion that a recklessness standard is the appropriate one to apply in the sports context is founded on more than a concern for a court's ability to discern adequately what constitutes reasonable conduct under the highly varied circumstances of informal sports activity. The heightened standard will more likely result in affixing liability for conduct that is clearly unreasonable and unacceptable from the perspective of those engaged in the sport yet leaving free the supervision of the law the risk-laden conduct that is inherent in sports and more often than not assumed to be "part of the game."

One might well conclude that something is terribly wrong with a society in which the most commonly-accepted aspects of play—a traditional source of a community's conviviality and cohesion—spurs litigation. The heightened recklessness standard recognizes a commonsense distinction between excessively harmful conduct and the more routine rough-and-tumble of sports that should occur freely on the playing fields and should not be second-guessed in courtrooms.

*Id.* at 965 (citation omitted).

■ Accordingly, absent intentional or reckless conduct, the doctrine of primary as-

sumption of risk is a bar to an action by one participant against another participant if the action involved an inherent risk of the activity. In other words, a participant owes no duty to a co-participant for actions involving an inherent risk, unless he or she intentionally injures another player or his or her conduct was sufficiently reckless to be outside the normal or ordinary part of the game.[6]

Here, Yoneda was not in the line of Tom's play; nor was Yoneda in a location where any one could reasonably believe that he was in danger of being struck by a ball being hit from the fairway towards the green of the fifth hole. It was not until after the ball was hit and bounced several times in the direction that it did, just as Yoneda came around the restroom building, that any one thought it necessary to shout a warning, by which time it was too late. Tom admitted that he did not see Yoneda until after Yoneda emerged from behind the restroom building and that, by then, he could not timely warn Yoneda of the errant shot. Inasmuch as Yoneda adduced no evidence that Tom intentionally injured him or acted recklessly beyond the ordinary activities of golf, the doctrine of primary assumption of risk applies, and Yoneda's action against Tom is barred. Moreover, based on the evidence presented, Tom's failure to yell "fore" when he hit the errant shot cannot be said to have been intentional or reckless conduct that falls outside the range of the ordinary activities involved in golfing. See Dilger, 63 Cal.Rptr.2d at 594 (holding that golf etiquette, i.e., yelling "fore" to warn others of errant shots, "does not necessarily rise to the level of a duty").

Based on the foregoing, we conclude that, (1) by his participation in the sport of golfing, Yoneda assumed all of the ordinary dangers incident to the game, i.e, the inherent risks; (2) as a co-participant, Tom's errant shot was neither intentional nor reckless, and (3) Tom

had no duty to warn Yoneda of the errant ball. Indeed, it is common knowledge that not every shot played by a golfer goes exactly where he intends it to go. As the Dilger court observed, "[i]f every ball behaved as the golfer wished, there would be little 'sport' in the sport of golf." 63 Cal.Rptr.2d at 593. Accordingly, we hold that primary implied assumption of risk applies and that the circuit court did not err in applying the doctrine so as to bar Yoneda's claim against Tom.[7]

### 3. Assumption of Risk as Applied to Sports Shinko

■ First, Yoneda argues that, inasmuch as two of his claims involved breach of implied warranty and defective product claims, summary judgment based upon assumption of risk was improper in light of Larsen's specific abolition of the doctrine as to these claims. Second, with respect to his negligence claim, Yoneda contends that there was a disputed question of fact whether Sports Shinko increased the inherent risk that Yoneda would get hit by an errant golf ball. In particular, he argues:

> If [Sports Shinko] exercised reasonable care and routed the cart path in front of the restroom, erected a safety netting, installed plexiglass windshields on the carts, and/or placed warning signs for golfers headed to the 6th tee, the risk of [Yoneda] being hit by a golf ball and seriously injured would have been greatly minimized or eliminated. Their failure to exercise this reasonable care consequently increased the risk of being hit, nullifying the application of primary assumption of risk defense against [Yoneda's] negligence claims.

Although Yoneda sets forth in his complaint three counts against Sports Shinko, Yoneda's breach of implied warranty and de-

---

**6.** We note that, although the circuit court apparently grounded its conclusion upon the incorrect inquiry as to whether the co-participant's alleged negligent conduct *increased* the risk of injury to another participant, we, nevertheless, reach the same conclusion as did the circuit court when applying the recklessness or intentional conduct standard to this case.

**7.** In so holding, this court need not address Yoneda's argument that "[t]he trial court in actuality applied the doctrine of *secondary assumption of risk* to bar [his] negligence claims." (Emphasis in original.) However, we note that the circuit court clearly indicated that it was "persuaded by the points and authorities cited" by Tom, who did not base his contentions on the secondary assumption of risk, but rather on the primary sense of the defense.

fective product claims essentially fall under the category of creating or increasing risks beyond those inherent in the sport. We, therefore, consider them as factors advanced by Yoneda to support his argument that Sports Shinko created or increased the inherent risk of being struck by an errant golf ball, thereby, causing his injuries.

■ As previously stated, Sports Shinko, as the owner of a golf course, "ha[s] a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." *Knight*, 11 Cal.Rptr.2d 2, 834 P.2d at 708; *see also Foronda*, 96 Hawai'i at 66, 25 P.3d at 841. In that regard, Sports Shinko "has an obligation to design a golf course to minimize the risk that players will be hit by golf balls, *e.g.*, by the way the various tees, fairways and greens are aligned or separated." *Morgan*, 40 Cal.Rptr.2d at 253 (citation omitted). Moreover, "because of the alignment or separation of the tee[s], fairway[s] and/or greens" at the Mililani Golf Course, Sports Shinko "may also have a duty to provide protection for players from being hit with golf balls where the greatest danger exists and where such an occurrence is reasonably to be expected[.]" *Id.* (citation omitted). We recognize, however, that,

> [i]f a risk is inherent in a sport, the fact that a defendant had a feasible means to remedy the danger does not impose a duty to do so. A duty is not created because safer materials are available to remedy the danger. The standards in the industry define the nature of the sport.

*Am. Golf Corp.*, 93 Cal.Rptr.2d at 688 (citations omitted) (emphasis added).

In the instant case, Yoneda contends that the circuit court erred in granting Sports Shinko's motion for summary judgment inasmuch as "there was a disputed question of fact whether [Sports Shinko's] *increased the risk* that [Yoneda] and other golfers would get hit [by errant balls]." (Emphasis in original.) In support of his position, Yoneda points to the evidence that, in his view, establishes the existence of a question of fact: (1) his affidavit that golfers heading to the sixth tee were required to follow the cart path behind a restroom building, obscuring them from the sight of golfers approaching the fifth hole green; and (2) Tom's testimony that he did not see the cart approaching the sixth tee box from behind the restroom and, thus, did not yell "fore" and that the carts did not have windshields. Yoneda maintains that the question whether Sports Shinko's failure to route the cart path in front of the restroom, erect safety netting, install plexiglass windshields on the carts, and/or place warning signs for golfers headed to the sixth tee increased the inherent risk that he would be struck by a golf ball is for the jury to decide and is not subject to summary judgment. In essence, Yoneda urges this court to consider this case as one under the secondary assumption of risk doctrine because Sports Shinko owed a duty of care to Yoneda in the design and maintenance of its golf course and golf cart.

■ Conversely, Sports Shinko maintains that Yoneda's claims are barred by the doctrine of primary assumption of risk, arguing that there is no evidence that it increased the inherent risk of engaging in the sport. Specifically, Sports Shinko argues that Yoneda's contention that Sports Shinko increased the inherent risk of getting struck by an errant golf ball by not taking additional protective measures, such as installing netting, redesigning the golf course, posting signs or equipping its carts with protective plexiglass windshields, is "actually charging that Sports Shinko breached an obligation to *decrease* the *inherent* risk[.]" (Emphases in original.) Further, Sports Shinko argues that Yoneda has failed to introduce any admissible evidence that its design of the golf course (and/or failure to erect safety netting or supply golf carts with windshields) fell below the applicable standard of care (thereby increasing the inherent risks), asserting that:

> Yoneda's affidavit, consisting entirely of his own, self-serving, personal opinions on what Sports Shinko *could* have done to *reduce* the chance that he would have been struck by an errant golf ball, without any background in golf course or golf cart design, or any other showing of competence to testify as to the standard of care of golf course owners, is tantamount to pure speculation and mere argument. As such, [ ] Yoneda's personal opinions were inadmissi-

ble and incapable of creating a justiciable dispute as to whether or not Sports Shinko breached a duty of care.

(Emphases in original.)

With respect to Sports Shinko's position that Yoneda's non-expert/lay testimony was insufficient, the Intermediate Court of Appeals' (ICA) opinion in *Nielsen v. Am. Honda Motor Co.*, 92 Hawai'i 180, 989 P.2d 264 (App.1999), is enlightening.

In *Nielsen*, the plaintiff-driver filed a complaint against the defendants—the manufacturer and distributor of Honda automobiles—for injuries sustained when the driver's automobile air bag failed to deploy in a collision. The complaint, *inter alia*, alleged that the defendants were strictly liable for selling a vehicle which was "defective and dangerous to the user and consumer in that [its] air bag failed to inflate as it should have on impact; [and] breached their implied warranty of merchantability by selling the car that was unfit, defective, and unsafe[.]" *Id.* at 182, 989 P.2d at 266 (internal quotation marks and ellipsis omitted). Thereafter, the defendants moved for summary judgment, claiming that there was no defect in the subject vehicle and, therefore, no genuine issues of material fact for trial. In support of their motion, the defendants offered expert testimony, attempting to establish, *inter alia*, that: (1) the damage to the car was the result of a minor front end collision and was of an "insufficient magnitude and duration to cause the air bag to deploy[,]" *id.* at 183, 989 P.2d at 267 (internal quotation marks omitted); (2) the air bag system was not defective; and (3) the air bag system met "all Honda specifications." *Id.* In response, the plaintiff provided his affidavit, wherein he represented himself as an expert on air bag systems and opined that the defendants' expert's evaluation did not include appropriate tests, such as an examination of the sensors and a clock spring in the steering wheel. He further stated that he had reviewed the Honda air bag specifications, which indicated air bag deployment would occur at a 30–miles–per–hour impact. He then recounted that, at the time of the impact, his vehicle was moving at least 30 miles per hour when it collided with another vehicle and that the air bag system did not deploy. *Id.*

The circuit court granted the defendants' summary judgment motion, finding no genuine issues of material fact, and dismissed the plaintiff's claims. In the circuit court's view, the plaintiff's affidavit lacked sufficient facts to establish that he was competent to testify. *Id.* at 184, 989 P.2d at 268. On appeal, the ICA vacated the circuit court's order. In so doing, the ICA first recognized that:

> [T]he use of expert testimony[ [8]] in summary judgment proceedings seems counter-intuitive. "After all, summary judgments are only proper when no factual disputes exist, and the stock-in-trade of the expert witness is venturing opinions on the issues of fact." E. Brunet, *The Use and Misuse of Expert Testimony in Summary Judgment*, 22 U.C. Davis L.Rev. 93, 93 (1988). Indeed, the very presence of an expert implies that issues of fact exist. However, contemporary decisions allow experts to testify in generalized terms and often grant summary judgment for the movant on the basis of such testimony. Another reason is that summary judgment may be used as a docket clearing device which tests the issues of a case and exposes frivolous claims.
>
> . . . .
>
> [T]his court has recognized that the majority of jurisdictions allow expert affidavits at summary judgment. While the view that such affidavits should be scrutinized is sound, we consider our trial and appellate courts capable of sifting facts from opinion in an expert's affidavits and of determining the effect to be given such

---

8. Hawai'i Rules of Evidence (HRE) Rule 702 (1993) provides that:

 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

affidavit within the present framework for deciding summary judgment motions.

*Id.* (citations, internal quotation marks, and brackets omitted). Second, the ICA concluded that the plaintiff's affidavit qualified him to testify as an expert witness pursuant to HRE Rule 702 because he had 20 years of experience as a licensed auto mechanic, he was certified as a mechanic by a national organization, and that, in his profession. he had worked on Honda automobiles. *Id.* at 183, 188–89, 989 P.2d at 267, 272–73 (noting that "a witness should not be disqualified as an expert if summary judgment papers demonstrate a HRE Rule 702 basis for qualification; any purported deficiency in expertise should go to the weight of the witness'[ ] testimony at trial"). Notwithstanding the above conclusion, the ICA nevertheless believed that a lay person may render opinions pursuant to HRE Rule 701 (1993), quoted *infra*, sufficient to raise a triable issue, thereby precluding summary judgment:

> The court's rejection of Plaintiff's affidavit was seemingly premised on its jaundiced view of his qualifications as an expert. While we believe the court erred in this regard, *see* discussion *infra, we consider Plaintiff's affidavit as arguably sufficient to raise triable issues based on his lay opinion alone.* Plaintiff's affidavit contained his personal observations to the effect that (1) the air bag failed to inflate (2) in a collision, when (3) Plaintiff's vehicle was traveling at least thirty miles per hour at impact. According to him, the impact was substantial enough to cause (4) the other vehicle involved to roll onto its roof and to travel fifty feet, and (5) injuries to Plaintiff as a result of the collision. *These facts are admissible and competent evidence because Plaintiff, as a person present, was an eyewitness to the accident and therefore had knowledge of the facts related.*

*Id.* at 186, 989 P.2d at 270 (emphases added) (footnote omitted).

Here, neither Yoneda nor Sports Shinko offered any expert testimony. Rather, as previously stated, Sports Shinko maintained that there is no evidence in the record that it increased the inherent risk of golf. Yoneda, however, submitted his own affidavit, attesting in relevant part that:

1. *I am the Plaintiff in the above-entitled case and have personal knowledge of the events surrounding the accident of August 20, 1999 and am competent to testify as to the matters contained herein.*

2. *I was a passenger in a golf cart driven by Albert Sabog at the 6th hole of Mililani Golf Course when I was struck in the left eye by a ball hit by Defendant Andrew Tom.*

3. *I had just completed playing the 5th hole and was heading toward the 6th hole tee off while traveling on the designated cart path. The cart path looped in a "U-turn" behind a restroom building, then headed straight to the 6th tee.* My group had been advised by Mililani Golf Course that the carts had to remain on the cart path at all times that day.

4. Had the cart path been routed in front of the restroom building (relative to the golfers approaching the 5th hole green), our carts would have been visible to the approaching golfers at all times while in the vicinity of the errant golf shot.

5. The cart path, as routed, required our cart to disappear from the view of golfers approaching the 5th hole green and prevented me from sighting the golf ball hit by Defendant Andrew Tom. This routing was dangerously defective as it greatly increased the risk of being struck by an errant golf shot hit toward the 5th hole green, which was immediately adjacent to the restroom.

6. If I had sighted or received a warning that a golf ball was heading toward my direction, I would have taken immediate evasive or protective action, including covering my head and face.

7. I have played at Mililani Golf Course on prior occasions and personally saw a safety netting installed between the approach area for the 9th green and the 10th tee off and fairway. Had such safety netting been installed between the cart paths on the 5th and 6th holes in the vicinity of the restroom, I would not have been hit by Defendant Tom's golf ball. [Sports Shinko's] failure to provide this protection

greatly increased the risk of my being struck by Defendant Tom's golf ball and is an inherent defect in the course design.

8. I have played at courses where the golf carts were equipped with plexiglass windshields. Included among these are the municipal Pali Golf Course. Having carts with such windshields does not impair my ability to participate in the game of golf.

9. Carts with plexiglass windshields provide me with a greater measure of protection from golf balls hit toward my face while riding in said cart.

10. Had the golf cart that I was riding in at the time of the accident of August 20, 1999 been equipped with a plexiglass windshield, I would not have been struck in the eye by Defendant Tom's golf ball.

11. Based on the route of the cart path from the 5th hole green to the 6th hole tee off, and the failure to provide additional safety measures such as a safety netting, Mililani Golf Course should have equipped their carts with [ ] plexiglass windshield[s].

(Emphases added.) Yoneda also referred to Tom's testimony, wherein he testified that the course's design (*i.e.*, routing carts behind the restroom) prevented him from seeing the carts. Tom claimed that he could not see the carts emerging from behind the restroom building and, thus, failed to yell any warning of the errant shot. In response, Sports Shinko argued that Yoneda's affidavit was inadmissible because testimony as to the design of the golf course or cart required an expert witness.

 Preliminary, we reiterate that this court "review[s] a circuit court's grant or denial of summary judgment *de novo* under the same standard applied by the circuit court." *Hawai'i Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000) (brackets and citation omitted). In considering a motion for summary judgment, evidence must be viewed in the light most favorable to the non-moving party. *City & County of Honolulu v. Sherman*, 110 Hawai'i 39, 48–49, 129 P.3d 542, 551–52 (2006). Thus, the court must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion. *Coon v. City & County of Hono-*

*lulu*, 98 Hawai'i 233, 244–45, 47 P.3d 348, 359–60 (2002). Further, this court has indicated that:

> The burden is on the party moving for summary judgment (moving party) to show the absence of any genuine issue as to all material facts, which, under applicable principles of substantive law, entitles the moving party to judgment as a matter of law. This burden has two components. First, the moving party has the burden of producing support for its claim that: (1) no genuine issue of material facts exists with respect to the essential elements of the claim or defense which the motion seeks to establish or which the motion questions; and (2) based on the undisputed facts, it is entitled to summary judgment as a matter of law. *Only when the moving party satisfies its initial burden of production does the burden shift to the non-moving party to respond to the motion for summary judgment and demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.*
>
> Second, the moving party bears the ultimate burden of persuasion. This burden always remains with the moving party and requires the moving party to convince the court that no genuine issue of material fact exists and the moving part[y] is entitled to summary judgment as a matter of law.

*Lee v. Puamana Cmty. Ass'n*, 109 Hawai'i 561, 567, 128 P.3d 874, 880 (2006) (quoting *French v. Hawai'i Pizza Hut, Inc.*, 105 Hawai'i 462, 470, 99 P.3d 1046, 1054 (2004)) (underscored emphasis in original) (bold emphasis added). Moreover,

> [o]nce the moving party has met [his or her] burden, the adverse, or non-moving party[,] must set forth specific facts showing that *there is at least one genuine issue for trial.* In so doing, the adverse party may not rest on mere allegations, denials or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. In other words, the non-moving party must show more than ... some metaphysical doubt as to the material facts, for the mere existence of a scintilla of evidence in support of

his [or her] position is insufficient to survive summary judgment.

*Springwall, Inc. v. Timeless Bedding, Inc.,* 207 F.Supp.2d 410, 416 (M.D.N.C.2002) (emphasis added) (citations and internal quotation marks omitted).

Although there is no doubt that Yoneda's affidavit is insufficient to qualify him as an expert in golf course/cart design, we believe that, similar to *Nielsen,* Yoneda's affidavit and Tom's testimony, viewed in the light most favorable to Yoneda as the non-moving party, are sufficient to raise at least one triable issue, *i.e.,* whether Sports Shinko increased the inherent risk by routing the cart path behind the subject restroom.

■ HRE Rule 701 provides that:

**Opinion testimony by lay testimony.** If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

The commentary to HRE Rule 701 states that the rule "retains the common-law requirement that lay opinion be based upon firsthand knowledge[.]" *See also State v. Jenkins,* 93 Hawai'i 87, 105, 997 P.2d 13, 31 (2000). Thus, for opinion testimony to be admissible under HRE Rule 701, "the witness must have personal knowledge of [the] matter tha[t] forms the basis of testimony of opinion; the testimony must be based rationally upon the perception of the witness; and[,] of course, the opinion must be helpful to the jury." *State v. Toyomura,* 80 Hawai'i 8, 25, 904 P.2d 893, 910 (1995) (quoting 1 J. Strong, *McCormick on Evidence* § 11, at 45–46 (4th ed.1992)).

Like the plaintiff's affidavit in *Nielsen,* Yoneda's affidavit contained personal observations, essentially, that: (1) he was following the cart path, which looped behind a restroom building; and (2) as he emerged from behind the building, he was struck in the eye by an errant golf ball. Yoneda's testimony as to the events leading up to the accident and his observations regarding the location of the restroom building and the route of the cart path did not require "scientific, technical, or other specialized knowledge" such that expert testimony would have been required pursuant to HRE Rule 702, *see supra* note 8. Nor was it necessary to proffer expert testimony to establish Tom's statement that the restroom building prevented him from seeing Yoneda. These facts are admissible and competent evidence because Yoneda and Tom, as persons present and involved in the accident, were eyewitnesses and had personal knowledge of the facts related.

Accordingly, based on the foregoing, Yoneda's opinion (as well as Tom's testimony) as to the location of the restroom building and the cart path are admissible as lay opinions under HRE Rule 701 supporting Yoneda's contention that a genuine issue of material fact exists. Clearly, Sports Shinko failed to carry its burden of proof and persuasion that it is entitled to summary judgment as a matter of law. Sports Shinko did not challenge Yoneda's or Tom's statements with contrary facts; it merely points out that Yoneda is not a golf course design expert and that Yoneda did not retain such an expert. As discussed *supra,* nothing in the law requires that the opinion of a design expert is required to prove circumstances of an accident. We, therefore, believe that the circuit court erroneously granted summary judgment in favor of Sports Shinko because Yoneda raised at least one genuine issue of fact as to whether Sports Shinko increased the risk of being struck by errant shots by its golf course design, that is, by routing the cart path behind the restroom building. *See Springwall, Inc.,* 207 F.Supp.2d at 416; *see also Williams v. Pennsylvania State Police– Bureau of Liquor Control Enforcement,* 108 F.Supp.2d 460, 468 n. 7 (E.D.Pa.2000) (holding that, "as one genuine issue of material fact is sufficient to defeat summary judgment on this claim, [the court] need not search for additional issues of fact").[9]

9. Having set forth the standard of care or duty an owner or operator owed to participants, we need not address Yoneda's final contention that a special relationship existed between him, as invitee, and Sports Shinko, as the possessor of land,

## IV. CONCLUSION

Based on the foregoing, we vacate that portion of the First Circuit Court's November 14, 2003 first amended final judgment entered in favor of Sports Shinko and remand this case for further proceedings consistent with this opinion. We affirm that portion of the amended final judgment entered in favor of Tom.

to give rise to a duty to protect Yoneda against

being hit by errant shots.